[Cite as *Moreno v. Soto*, 2022-Ohio-1963.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| RICARDO JOSE MORENO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2021-CA-44 |
| | : | |
| v. | : | Trial Court Case No. 2020-DR-8 |
| | : | |
| JESSICA SOTO | : | (Domestic Relations Appeal) |
| | : | |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 10th day of June, 2022.

. . . . . . . . . . .

RICARDO JOSE MORENO, 11530 Miro Circle, San Diego, California 92131
    Plaintiff-Appellee, Pro Se

JESSICA SOTO, 1528 East Lynn Drive, Beavercreek, Ohio 45432
    Defendant-Appellant, Pro Se

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, Jessica Soto, appeals pro se from a divorce decree entered in the trial court. Plaintiff-Appellee, Ricardo Jose Moreno, is also proceeding pro se. According to Soto, the decree that was filed was not what the parties had agreed to and was obtained through deceptive means. Soto further contends that the decree is inconsistent with the agreement read into the record and that child support computations were calculated with erroneous data. Finally, Soto argues that the trial court erred by disregarding a requirement that Moreno make full disclosure of debts.

{¶ 2} After reviewing the record, we conclude that the trial court did not err in filing the divorce decree, which was based on an agreement read into the record during the final divorce hearing. As an initial point, most matters Soto alleges are based on evidence that is not in the trial court record and therefore cannot be considered on appeal. In addition, while Soto claims that fraud occurred, she failed to file a motion related to that issue with the trial court before judgment was entered. As a result, Soto's proper remedy would be to file a motion for relief from judgment under Civ.R. 60(B). Furthermore, the few items that can be considered on appeal do not demonstrate error. And, in one of these instances, even if error occurred, it was harmless. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

{¶ 3} On January 13, 2020, Moreno filed a complaint in the trial court, seeking a divorce from Soto. According to the complaint, the parties were married on February 14,

2001, and had four children (A.M., born in July 2001; D.M., born in May 2005; V.M., born in February 2007; and E.M., born in May 2009). When the complaint was filed, the children were, respectively, ages 18, 14, 12, and 10. On the day the complaint was filed, the court issued mutual restraining orders that prevented the parties from disposing of personal and real property, removing property from the marital residence, incurring debt, and so on.

**{¶ 4}** Soto filed an answer and counterclaim for divorce on February 14, 2020. The court then ordered the parties to mediation and, on May 11, 2020, appointed a guardian ad litem ("GAL"). In August 2020, the court filed an order requiring that the minor children remain in Greene County, Ohio, during the pendency of the proceedings, and it set a final divorce hearing for September 22, 2020. After Soto filed a motion to show cause alleging that Moreno had failed to comply with the court's mutual restraining orders, the court set a contempt hearing for September 8, 2020. However, service was not perfected because, according to a notation on the service tracking, Moreno had moved to California.

**{¶ 5}** Nothing further occurred until October 5, 2020, when the magistrate filed an order indicating she would interview the minor children on October 28, 2020. A final contested hearing was set for January 7, 2021. However, based on Moreno's unopposed motion stating that the parties were resolving the matter, the final hearing was converted into a telephone conference. After the conference, the court issued an order on January 11, 2020, indicating that if the parties were unable to settle personal property division, they were to bring lists of property to court and choose items on an alternating

basis. The court also set a final hearing for April 12, 2021.

{¶ 6} On April 6, 2021, Moreno filed a pretrial statement listing the parties' assets, income, and liabilities. Despite the parties having a substantial combined income, the pretrial statement showed very few assets, a mortgage on real property in Bloomington, Indiana, that had not been paid since March 2020, and approximately $200,000 in debt, which was to be supplemented by past due taxes for 2013-2016. Soto did not file a pretrial statement.

{¶ 7} An interim order was filed on April 12, 2021, indicating that the parties had agreed that it would be in the best interest of the minor children to spend time in San Diego with Moreno. As a result, Moreno was given summer visitation from the first weekend after school recessed until July 26, 2021. The parties also agreed that the GAL would prepare a supplemental report. However, if the GAL were required to travel to San Diego, Moreno agreed to pay the GAL's travel costs. The final hearing was also reset for July 27, 2021. Subsequently, on July 21, 2021, Moreno filed a motion seeking to hold Soto in contempt for bringing one child back to Ohio on July 2, 2021, which allegedly disrupted the GAL's planned visit with the children in San Diego. The court then set a contempt hearing for July 27, 2021.

{¶ 8} On July 27, 2021, the magistrate held the final divorce hearing. At that time, the parties said they had reached an agreement on all issues pending before the court. July 27, 2021 Transcript ("Tr.") p. 5. Both parties were represented by counsel at the hearing, and Moreno's attorney read the agreement into the record. *Id.* at p. 6. At that time, the parties agreed that Soto would be the residential parent and legal custodian of

D.M. (who was 16 years old), and that Moreno would be the residential and legal custodian of the two younger children (V.M. and E.M., who were then ages 14 and 12, respectively). *Id.* at p. 7. (The oldest child was no longer a minor.) Soto was allowed parenting time with V.M. and E.M. during winter and spring breaks, and for a minimum of four weeks during the summer. *Id.* at 7-8 and 10-11. Moreno's parenting time with D.M. would be as agreed upon by the parents and D.M. *Id.* at p. 12.

{¶ 9} There was no provision for spousal support. Child support until D.M. was emancipated was estimated at $169 per month, based on calculating for three children, taking one-third of that amount, and doing a downward adjustment of $150 a month to account for Soto's payment of travel expenses. *Id.* at p. 14-15. Soto was the obligor on that amount. After D.M. graduated from high school, the support would be recalculated for two children, again with a $150 downward adjustment for travel expenses. That child support was calculated at $636 per month, with Soto again being the obligor. *Id.* at p. 15.

{¶ 10} At the time of the hearing, the Indiana real estate was under contract for sale for $245,000, and the parties had agreed to place that money in a trust account with Moreno's attorney. They also agreed to pay outstanding tax debt from that amount, which was approximately $24,226. Tr. at p. 15. Of the amount remaining, half was to be paid to Moreno. Of the half remaining to be paid to Soto, $15,000 was to be paid to Moreno as reimbursement for expenses incurred in preparing the house for sale, for storage of household goods, for reimbursement of tax refunds taken from Moreno to pay joint tax debt, and for certain expense associated with a house in Beavercreek that the

parties had rented. *Id.* at p. 15-16. The $15,000 amount also reflected a $2,200 deduction for funds Moreno was contributing toward D.M.'s orthodontic expenses. *Id.* at p.16. Moreno's attorney described the $15,000 deduction from Soto's half of the sale proceeds as "a global settlement of debts owed." *Id.*

{¶ 11} The parties further agreed that they would each be entitled to one-half of the other's retirement benefits, that they would retain their own vehicles and bank accounts, and that any credit card debt would be paid by the account owner. *Id.* at p. 16-17. Soto was to maintain health insurance for the children and claim D.M. as a dependent on all tax returns; Moreno was to claim V.M. The parties would alternate E.M. as a dependent beginning with the current year, in which Soto would claim E.M. Soto would then continue to claim E.M. as a dependent in odd-numbered years, while Moreno would claim E.M. in even-numbered years. *Id.* at p. 18-19.

{¶ 12} As far as household goods were concerned, the parties discussed the fact that those goods were then in storage. Moreno's attorney stated that the parties had agreed that Soto could have whatever she wanted, but that she would have to get the items within a week. After that, Moreno would dispose of any remaining items, and the cost would be split between the parties and paid from the net sale proceeds of the house. *Id.* at p. 21. Soto acknowledged hearing this. *Id.* The court also explained that it had adopted a local rule allowing parties only one year to bring litigation regarding personal property exchanges. *Id.* at p. 22.

{¶ 13} At that time, Moreno explained to the court that the personal property had to be removed from the Indiana home and that storage costs had been accumulating,

such that the bill was a little in arrears and needed to be brought current. *Id.* Moreno's attorney also said that the funds for that would be part of the $15,000 global settlement, but that Soto would have to go within the next week to get her property out. *Id.* at p. 22-23. The attorney further noted that the storage facility might not let Soto in if an outstanding bill existed. *Id.* at p. 23.

{¶ 14} At that point, Soto interjected that she had talked to the storage facility, and she could not get access to the unit until the bill was paid. *Id.* Moreno's attorney explained that they would not have access to the money for the bill until the house sale closed, which might not be for a few weeks. *Id.* at p. 23-24. The court then said, "Okay. So when the house closes, please * * * immediately notify. She gets seven days from that notification that * * * she has access. So notification from the paid bill * * * [t]o pick out anything she wants." *Id.* at p. 24.

{¶ 15} After discussing a few more matters, the court asked Soto's attorney if he had anything to add, and he said, "There is not, Your Honor. It covers everything." *Id.* at p. 27. Soto's attorney also stated that he would be drafting the final decree. *Id.*

{¶ 16} At the end of the hearing, the court asked each party the same questions. The following exchange occurred with Soto:

> THE COURT: * * * Jessica, you also heard everything that was read into the record today, correct?
>
> MS. SOTO: Yes, Your Honor.
>
> THE COURT: And you discussed it with Mr. Miller [your attorney]?
>
> MS. SOTO: Yes, I did.

THE COURT: You – you're satisfied he answered all your questions and explained everything to you?

MS. SOTO: Yes.

THE COURT: So you're entering into this agreement knowingly and intelligently?

MS. SOTO: Yes, I am.

THE COURT: When you came to this agreement, did you disclose all your assets and liabilities to your attorney and your spouse?

MS. SOTO: Yes, I did.

THE COURT: You're relying on the fact that Ricardo did the same?

MS. SOTO: Yes.

THE COURT: You also have been coming to court on this case for quite some time, you feel you've had adequate time to present all the issues to the court?

MS. SOTO: Yes.

THE COURT: And you also understood that you had the right to have a full hearing on any issues today?

MS. SOTO: Yes, I did.

THE COURT: Instead, you want to enter into this agreement?

MS. SOTO: Yes.

THE COURT: And realizing nobody gets everything they want when they divide marital property, you're willing to agree this is fair and

equitable?

MS. SOTO:   Yes.

THE COURT:   And you're doing so voluntarily?

MS. SOTO:   Yes, I am.

THE COURT:   I know that the parenting plan contained herein isn't everything that you wanted.   I'm very well aware of that.   But you're willing to agree that at – for the time being this is in the best interest of your children?

MS. SOTO:   Yes.

THE COURT:   You also understand issues with the children remain under the continuing jurisdiction of the court?

MS. SOTO:   Yes, I do.

THE COURT:   And you want the Court then to have this reduced to writing and filed as your final judgment entry and decree of divorce?

MS. SOTO:   Yes, I do.

THE COURT:   You're satisfied with your legal representation?

MS. SOTO:   Yes, I am.

THE COURT:   And Mr. Miller, is there anything you wanted to ask that I did not?

MR. MILLER:   No, thank you, Your Honor.

Tr. at p. 30-32.

{¶ 17} The court then accepted the agreement and ordered that it be reduced to

writing and filed as the parties' final judgment entry and decree of divorce. *Id.* at p. 32-33. The court also told the parties that the divorce would not be final until they received a file-stamped copy in the mail. *Id.* at p. 33.

{¶ 18} Although the court ordered the decree to be submitted by August 20, 2021, Soto's counsel requested an extension of time due to his own dental surgery and received an extension until September 15, 2021. The decree was ultimately filed on November 18, 2021, and was signed by the attorneys for both parties. Soto then timely appealed from the judgment.

## II. Error in Entering Divorce Decree

{¶ 19} Soto's first assignment of error states that:

The Trial Court Erred by Accepting an Entry of the Decree of Divorce That Was Not Agreed to by Both Parties and That Was Obtained Through Deceptive Means and Fraudulent Misrepresentations.

{¶ 20} Under this assignment of error, Soto contends that she was led to agree to the divorce settlement based on fraudulent representations regarding the following matters: (1) the parties' joint tax liability; (2) her attorney's statement that the trial court would not award spousal support; and (3) the fact that child support arrearages Moreno owed would be included in the monthly support obligation. According to Soto, her attorney told her before they went into the hearing that the agreement being read into the record might sound different than what had been agreed upon. The attorney said that despite this, he was preparing the decree and would incorporate what the parties had

agreed to before going into court (in other words, Soto's attorney would prepare a decree that did not correspond with what was said in court).

{¶ 21} Soto further states that she later notified her attorney twice that the decree did not match the parties' agreement. She notes that her attorney should have filed a motion seeking an evidentiary hearing but failed to do so.

{¶ 22} Before addressing this assignment of error, we note that both parties have elected to represent themselves pro se during this appeal. " 'It is well established that pro se litigants are presumed to have knowledge of the law and legal procedures and that they are held to the same standard as litigants who are represented by counsel.' " *State ex rel. Fuller v. Mengel*, 100 Ohio St.3d 352, 2003-Ohio-6448, 800 N.E.2d 25, ¶ 10, quoting *Sabouri v. Ohio Dept. of Job & Family Servs.*, 145 Ohio App.3d 651, 654, 763 N.E.2d 1238 (10th Dist.2001). We will apply that principle here.

{¶ 23} Another settled legal principle is that "[a] reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter." *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), paragraph one of the syllabus. Unfortunately, Soto's argument in connection with this assignment of error is based almost entirely on alleged conversations and events that occurred outside the divorce hearing and are not reflected in the record. We cannot add this material to the record and decide the appeal on that basis. What is in the record is the transcript of the divorce hearing.

{¶ 24} "When a husband and wife end their marriage, they have a fundamental choice to make about the division of property, the allocation of parental responsibilities,

and support.   The parties can reach an agreement as to these issues or the parties can litigate them and have the domestic relations court decide the issues."   *Walther v. Walther*, 102 Ohio App.3d 378, 382, 657 N.E.2d 332 (1st Dist.1995).   "When the parties enter into a settlement agreement in the presence of the court, such an agreement is a binding contract and neither a change of heart nor poor legal advice is a ground to set aside a separation agreement."   *Ingle v. Ingle*, 2d Dist. Greene No. 2005-CA-110, 2006-Ohio-3749, ¶ 51, citing *Walther* at 382-383.

{¶ 25} "To set aside a separation agreement on the ground that one of the parties was induced to sign the agreement as a result of the fraudulent acts of the other party, the essential elements of fraud must be established."   *DiPietro v. DiPietro*, 10 Ohio App.3d 44, 46, 460 N.E.2d 657 (10th Dist.1983), citing *Miller v. Knight*, 115 Ohio App. 485, 185 N.E.2d 770 (2d Dist.1961).   " 'The elements of an action in actual fraud are: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.' "   *Polk v. Polk*, 188 Ohio App.3d 809, 2010-Ohio-3355, 937 N.E.2d 124, ¶ 69 (2d Dist.), quoting *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 55, 514 N.E.2d 709 (1987).

{¶ 26} The transcript and trial court record do not reveal any evidence of fraud. To the contrary, the court quite thoroughly questioned both parties about their

understanding of the agreement as read in court and their agreement with what was said. We also note that the "fraud" alleged here primarily relates to Soto's attorney telling her that while the actual agreement differed from what would be disclosed to the court, he (the attorney) would change the decree to be submitted. Again, the record shows no evidence of this, and we cannot add matters outside the record. Any other matters of alleged "fraud," such as representations about tax liability or child support "arrearages," again, are not part of the record.

**{¶ 27}** "Furthermore, '[i]n order to effect a rescission of a binding settlement agreement entered into in the presence of the court, a party must file a motion to set the agreement aside; and, in the absence of such motion, a trial court may properly sign a journal entry reflecting the settlement agreement.' " *Behnken v. Behnken*, 2d Dist. Greene No. 2019-CA-39, 2020-Ohio-389, ¶ 17, quoting *Spercel v. Sterling Industries, Inc.*, 31 Ohio St.2d 36, 285 N.E.2d 324 (1972), paragraph two of the syllabus.

**{¶ 28}** Soto's remedy would have been to file a motion in the trial court before entry of the divorce decree. This was not done. Notably, Soto indicates in her brief that she received a copy of the proposed divorce decree and child computation worksheets from her attorney in October 2021. Appellant's Brief at p. 8. According to Soto, she contacted her attorney at that time about the difference between the decree and the discussions that occurred before the hearing. *Id.* If Soto's attorney failed to file a motion to correct any alleged problems, that is an issue between Soto and her attorney.

**{¶ 29}** Furthermore, if, as Soto also alleges, she did not realize the discrepancy until after receiving the final decree, her remedy would have been to file a Civ.R. 60(B)

motion within the time period specified in the rule.   Soto could have filed that motion with supporting affidavits, which would have allowed the trial court to consider the matter. Again, we are limited to matters contained in the record.

{¶ 30} Nearly everything that Soto alleges relates to matters that are not in the record, including arrangements about the parties' storage units; events that occurred during August 2020 between the parties; an event that occurred in January 2021, when Soto went to the martial property in Indiana; discussions between Soto and her attorney during settlement negotiations in July 2021; reasons why Soto chose to agree to various matters (tax liability, lack of spousal support, and child support); discussions between Soto and her attorney in October 2021; discussions with a storage company in October 2021; discussions between Soto and her attorney after she received the filed divorce decree in November 2021; and statements the trial court made about discovery matters during a January 2021 phone conference.   *See* Appellant's Brief at p. 3-8 and 12-14. None of these "facts" are in the record and we cannot consider them.   Accordingly, the first assignment of error is without merit and is overruled.


### III.   Discrepancies in the Divorce Decree

{¶ 31} Soto's second assignment of error states that:

The Trial Court Abused Its Discretion in Wrongfully Adopting and Entering a Decree of Divorce That Goes Beyond What Was Set Forth in the Agreement Discussed Between Parties as Well as Not Consistent With the Agreement Read Into the Record and Approved by the Court.

{¶ 32} Under this assignment of error, Soto contends that the divorce decree contains significant discrepancies from the parties' agreement. While Soto makes this assertion, this portion of her brief does not outline any specific discrepancies. To the extent that Soto is relying on matters asserted in connection with the first assignment of error, we have already rejected those arguments.

{¶ 33} We do note one item pertaining to tax exemptions. On page nine of her brief, Soto contends that the final decree incorrectly states that "tax claims" will start in the 2020 tax year, while the court stated in the transcript that dependent claims would begin as of 2021. This assertion is incorrect, and there was no error.

{¶ 34} As noted, the divorce hearing occurred in July 2021. During the hearing, the court stated that Soto would be allowed to claim D.M. as a dependent for tax purposes, and that Moreno would be able to claim V.M. as a dependent. Tr. at p. 18-19. No year was specified. The court then said, "where has [E.M.] lived the majority of the year, here, correct?" Soto and her attorney replied that this was the case. The court then said, "So – of this year, so mother will claim [E.M.] in odd years and father in even years. When D.M. emancipates, then father claims [V.M.] and mother claims [E.M.]. When [V.M.] emancipates, then we alternate, again. Okay? That takes care of that." *Id.*

{¶ 35} The court clearly was referring to the taxable year 2021 with respect to E.M. and stated that Soto's ability to claim E.M. as a dependent would begin in 2021 and continue thereafter in odd years. The decree is consistent with this fact. Concerning dependency exemptions, the decree states that:

IT IS ORDERED * * * that beginning in the 2020 tax year, to the extent permitted by law, so long as [D.M.] can be claimed as a dependent, Defendant-Wife shall be permitted to claim [D.M.] as a dependent and claim all applicable tax credits for him; Plaintiff-Husband shall be permitted to claim [V.M.] as a dependent and claim all applicable tax credits for him; and Defendant-Wife will claim [E.M.] in odd-numbered years and Plaintiff-Husband will claim [E.M.] in even-numbered years. * * *

Final Judgment and Decree of Divorce at p. 5.

{¶ 36} The trial court's inclusion of the year 2020 with respect to D.M. and V.M. is not error; as noted, no specific date was specified during the divorce hearing. Furthermore, Soto has failed to explain how she was prejudiced. Accordingly, even if error occurred, it would have been harmless. *E.g. Johnson v. Johnson*, 2d Dist. Greene No. 2019-CA-58, 2020-Ohio-4085, ¶ 11 (error that is not prejudicial will be disregarded); *Papp v. Papp*, 2d Dist. Montgomery No. 25333, 2013-Ohio-506, ¶ 17-20 (overruling harmless error).

{¶ 37} Soto also contends the decree incorrectly states that " 'the parties have agreed on the division of their household goods, furnishings, and personal property to their mutual satisfaction.' " According to Soto, the transcript indicates that the issue of whether the goods had been agreed upon was never answered because the court was interrupted. Appellant's Brief at p. 9, referencing Tr. at p. 20.

{¶ 38} Having reviewed the transcript, we disagree. When the trial court asked about personal property division, Soto's attorney indicated that there was one issue about

Moreno's military items, which were located at Soto's home. In response, Soto's attorney, Mr. Miller, said that "he [Moreno] can get that while he's here in town." Tr. at p. 20. The parties then went on to discuss the remaining household goods, which were items from the parties' Indiana home that were in storage.

{¶ 39} Concerning this matter, Moreno's attorney said, "And so we've agreed that, mom, if she wants to get any of those items, she's free to take anything that she wants from that. If – she needs to do that within a week." *Id.* at p. 21. As noted above, a discussion then ensued about unpaid storage fees, whether Soto could currently access the storage unit, and when the money from the sale of the parties' house would be available to pay the outstanding fees. *Id.* at p. 22-24.

{¶ 40} The following exchange then occurred:

THE COURT: Okay. So when the house closes, please not – immediately notify. She gets seven days from the notification that the – she has access. So notification from the paid bill.

* * *

THE COURT: So she has access. So she would need to go that weekend.

MR. ANDERSON: Right.

THE COURT: To pick out anything she wanted. Okay.

Tr. at p. 24.

{¶ 41} Accordingly, the personal property division was resolved, and the court did not err in stating this fact in the decree. What Soto is apparently upset about (again,

based on facts that are not in the record) is that three weeks after the July 27, 2021 hearing, the storage units were apparently auctioned off for non-payment. Appellant's Brief at p. 3. According to Soto, she learned about this on October 10, 2021, when she received a copy of the proposed divorce decree and contacted the storage company. *Id.* at p. 6-7. Soto further states that she then contacted her attorney; someone from his office later notified Soto that a phone conference was scheduled for October 18, 2021, to discuss the matter with the court and opposing counsel. However, Soto's attorney never reported back to her after the conference, and the first time she learned the decree was unchanged from the prior copy she had received was when she received it in the mail. *Id.* at p. 7.

{¶ 42} Again, none of this in the record, with the sole exception that the court did schedule a telephone conference for October 18, 2021. *See* Notice (Oct. 15, 2021). The record does not reveal what this conference was about; it could have concerned the fact that the decree had not been filed as required by September 15, 2021. It could also have concerned the issue Soto raises. However, we are limited to what is in the record and cannot consider any other matters.

{¶ 43} Furthermore, even if we assumed the truth of Soto's statements, she was aware of the alleged facts by October 10, 2021, more than a month before the final decree was filed. Again, Soto's remedy at that point was to file a motion with the trial court, which she failed to do. Even if we assume that Soto's attorney failed to do what was required and that Soto did not learn of this until she received the filed final decree, Soto's remedy at that point was to file a motion for relief from judgment. Anything else is

between Soto and her attorney. In either case, these issues are not before us and cannot be considered.

{¶ 44} An additional point not made under the second assignment of error but referenced elsewhere in Soto's brief relates to the court's inclusion, at page seven of the decree, of $2,200 in orthodontic expenses that Moreno paid. *See* Appellant's Brief at p. 10. This amount was included within the items for which the $15,000 deduction would be taken from Soto's share of the proceeds from the sale of the parties' property in Indiana. Final Judgment and Decree of Divorce at p. 7. According to Soto, Moreno's contribution represents only 50% of the orthodontic expense and it should be decreased by the respective share that each party is required to pay for extraordinary medical expenses under R.C. 3119.30 or R.C. 3119.32. Since Moreno has a greater income, he would be required to pay a proportionately greater amount of medical expenses.

{¶ 45} As with the other items, this matter was discussed during the divorce hearing, and the parties agreed that Moreno would be credited from the sales proceeds for $2,200 that he had contributed towards D.M.'s orthodontic expense. Tr. at p. 15-16. The record does not contain *any evidence* as to the total amount of the orthodontic expense. As has been stressed, we cannot add material to the record and decide an appeal based on matters that were not part of the trial court record. *Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500, at paragraph one of the syllabus.

{¶ 46} Based on the preceding discussion, the second assignment of error is overruled.

IV.  Errors in Child Support Computations

**{¶ 47}** Soto's third assignment of error is as follows:

The Trial Court Erred by Adopting and Entering Child Support Computation Worksheets That Were Calculated With Erroneous Data and Contrary to Ohio Law.

**{¶ 48}** Under this assignment of error, Soto contends that the child support worksheets have three major errors.  We review child support orders for abuse of discretion.  *Booth v. Booth*, 44 Ohio St.3d 142, 144, 541 N.E.2d 1028 (1989).  Furthermore, "[t]he decision whether to deviate from the child support guidelines and worksheet is a discretionary matter and will not be reversed absent an abuse of discretion."  *Mangen v. Mangen*, 2d Dist. Montgomery No. 29112, 2021-Ohio-3693, ¶ 7, citing *Havens v. Havens*, 10th Dist. Franklin No. 11AP-708, 2012-Ohio-2867, ¶ 6.

**{¶ 49}** " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary, or unconscionable."  (Citation omitted.)  *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).  However, "most instances of abuse of discretion will result in decisions that are simply unreasonable."  *Id*.  "A decision is unreasonable if there is no sound reasoning process that would support that decision."  *Id*.  After reviewing the matter, we find no abuse of discretion.

**{¶ 50}** Soto's first argument is that her gross income was entered on the worksheets as $69,874.07 when it should have been $55,617, as provided in the pretrial statement and tax forms submitted to opposing counsel.

**{¶ 51}** The documents in the record about Soto's income are inconsistent. Soto's claim that her income was only $55,617 is contradicted by her own financial affidavit, which states that her base yearly wages in 2019 were $65,000. Affidavit of Financial Disclosure (Feb. 14, 2020), p. 2. The affidavit also lists $18,332.17 in "overtime, commission, and bonuses," for the year 2019, which would resulted in a total income of $83,332.17 in 2019. *Id.* However, the final section on this page of the financial affidavit inconsistently states that Soto's total gross yearly income for 2019 was $65,000. *Id.* In any event, Soto's own account of her income was clearly well in excess of $55,617.

**{¶ 52}** In contrast, Moreno's pretrial statement lists Soto's 2019 income as $55,617. Plaintiff's Pretrial Statement (Apr. 6, 2021), p. 2. As noted, Soto did not file a pretrial statement.

**{¶ 53}** Nonetheless, there is no difference between the child support amounts the parties represented to the court during the divorce hearing and what is reflected on the worksheet and in the divorce decree. During the hearing, the parties did not discuss their specific incomes; instead, they told the court what the expected child support would be. These figures were the same as those used in the final decree and reflected in the child support computation worksheets. *Compare* Tr. at p. 14-15 ($139 per month currently, and $636 per month after D.M. is emancipated), with (1) the Final Judgment and Decree of Divorce (Nov. 18, 2021), p. 3 ($139.91 until D.M. is emancipated, and $636.58 per month thereafter); and (2) page 4 of the two child support computation worksheets attached to the divorce decree (showing the same amounts as the decree). Again, we are limited by what is in the record, and there is no evidence that the parties

erred in the amount of support to which they agreed during the divorce hearing.

{¶ 54} Again, Soto's attorney stated that he would prepare the divorce decree.   If error occurred in the income amounts used, Soto's remedy would be to file a Civ.R. 60(B) motion for relief from judgment.

{¶ 55} Soto's second argument is that the number of children used to calculate her support obligation was improperly entered as "3" when it should have been "1." Appellant's Brief at p. 17.   This is incorrect.

{¶ 56} The number of children listed on the first worksheet (which pertains to the time before D.M.'s emancipation) indicates that three children were involved in the order. This was correct.   Three children (D.M., V.M., and E.M.) were included in that order. This worksheet also included a deviation from the amount of support Soto was required to pay.   The deviation reduced Soto's monthly support obligation to $134.91 per month, just as the parties had agreed during the hearing.

{¶ 57} The number of children listed on the second worksheet, which pertains to the situation after D.M.'s emancipation, is two.   Again, this is correct, as there would only be two children remaining that would be subject to a child support order.

{¶ 58} Soto's final argument is that Moreno was listed as the sole residential custodian on both worksheets when she should have been listed as sole residential custodian for one worksheet.    In the divorce decree, Moreno is listed as the residential parent for V.M. and E.M., and Soto is listed as the residential parent for D.M. (who was 16 at the time).   As indicated, when D.M. is emancipated (presumably in 2023, when he turns 18 and has graduated from high school) Moreno would be the only residential parent

and legal custodian of the remaining two children.

**{¶ 59}** The child support computation worksheet for Greene County is entitled "Sole Residential/Shared Parenting." It does not have an option for designating both parents as a sole residential parent. It has two options: (1) "sole residential parent," in which case one party is designated the "obligor"; and (2) "shared parenting," again, in which one parent is designated as the "obligor." Since a choice had to be made, and Moreno was the residential parent and legal custodian for more children, Soto was apparently chosen to be the obligor, although Moreno had a greater income ($132,000 per year, as opposed to $69,874.07). We have no idea what the child support computation would have been if Moreno had been designated as the obligor (and we are not required to make this calculation). However, as noted, the minimal support Soto was required to pay per month until emancipation is almost precisely what the parties agreed to during the court hearing.

**{¶ 60}** Soto was given a significant downward deviation in support (minus $599.54) under R.C. 3119.23, due to "extended parenting time; extra travel," and "[a]ny other factor" ("Offset child support to be paid by other party"). Child Support Computation Worksheet at p. 4. Under R.C. 3119.22, a court is allowed to deviate "from the amount of child support that would otherwise result from the use of the basic child support schedule and the applicable worksheet if, after considering the factors and criteria set forth in section 3119.23 of the Revised Code, the court determines that the amount calculated pursuant to the basic child support schedule and the applicable worksheet would be unjust or inappropriate and therefore not be in the best interest of the child."

{¶ 61} Where the court does so, it "must enter in the journal the amount of child support calculated pursuant to the basic child support schedule and the applicable worksheet, its determination that the amount would be unjust or inappropriate and therefore not in the best interest of the child, and findings of fact supporting that determination." *Id.* The trial court did so here and included the findings that the basic amount "would be unjust and would not be in the best interest of the minor children for the following reasons: Defendant Wife will incur significant travel costs in transporting [V.M.] and [E.M.] to and from Plaintiff-Husband's home for parenting time." Final Judgment and Decree of Divorce at p. 3.

{¶ 62} Under the circumstances, we cannot find that the trial court abused its discretion. Again, the parties agreed to the amounts and to a deviation.

{¶ 63} Based on the preceding discussion, the third assignment of error is overruled.

## V. Full Financial Disclosure

{¶ 64} Soto's fourth assignment of error states that:

The Trial Court Erred as a Matter of Law When It Disregarded the Requirement That There Be Full Financial Disclosure in Regards to Appellee's Debts and Expenses Which Was in Violation of the Order of the Court for Full Disclosure.

{¶ 65} Under this assignment of error, Soto argues that the trial court erred by disregarding its own order for full financial disclosure and by letting Moreno enter

estimates of debts. According to Soto, the debts have been discovered to be "over-inflated or fraudulent." Appellant's Brief at p. 18.

{¶ 66} After again reciting a number of facts outside the record, Soto claims she is owed a total of $38,570. In this regard, Soto claims she should be paid money related to the costs of a storage unit for which she allegedly paid; costs for a house in Beavercreek; child support arrearages; money for expenses of storing goods when Moreno moved to California in 2020; the orthodontic expense; and the value of property auctioned off. Appellant's Brief at p. 20.

{¶ 67} As we have repeatedly stressed, these matters involve evidence that is not in the record. In the first place, since no child support was ordered during the pendency of this case, there were no arrearages. If an arrearage occurred after the final decree, that is not a matter for this appeal. In addition, the orthodontic issue has already been rejected, as has been argument about the storage costs and anything pertaining to items that may or may not have been auctioned. And finally, the record lacks any evidence either about a Beavercreek home or expenses for storing items in connection with a move to California. To the extent these latter points are even mentioned, it appears that they occurred in 2020, well before the settlement and final divorce hearing that occurred in July 2021.

{¶ 68} Based on the preceding discussion, the fourth assignment of error is overruled.

VI. Conclusion

{¶ 69} All of Soto's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, J. and LEWIS, J., concur.

Copies sent to:

Ricardo Jose Moreno
Jessica Soto
Hon. Cynthia G. Martin